**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Adam S. Grace**
**Abigail E. Rosen**
**Liora Sukhatme**
**Brenda Wai Ming Chang**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-0473 (Rosen)**
**RosenAb@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                    **Plaintiff,**<br><br>        **-against-**<br><br>**PAUL FELLER and**<br>**ICARO MEDIA GROUP, INC.,**<br><br>                                    **Defendants,** | **COMPLAINT**<br><br>**24 Civ. _____ (    )**<br><br><br>**JURY TRIAL DEMANDED** |

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Paul Feller ("Feller") and Icaro Media Group, Inc. ("Icaro") (collectively,

"Defendants"), alleges as follows:

## SUMMARY

        1.        Defendants Feller and Icaro —respectively, the chief executive officer of a

privately owned media technology company and the company itself—engaged in a multimillion-

dollar offering fraud.

2.      From at least 2017 to 2021 (the "Relevant Period"), Feller solicited investments in Icaro, raising over $22 million from at least 38 investors, by making fraudulent misrepresentations, among other things, about Icaro's business partnerships with two multinational telecommunication companies ("Telco 1" and "Telco 2", collectively, the "Telcos").

3.      Time after time, Feller falsely told potential investors that Icaro was either about to launch, or had already launched, digital platforms and mobile phone applications ("smartphone apps") with the Telcos, featuring sports content tailored to the Telcos' regional interests.

4.      In reality, throughout the Relevant Period, Defendants had not launched and were not poised to launch any such products with either Telco.

5.      While Telco 1 launched trial projects with Icaro prior to the Relevant Period, Telco 1 terminated all of them by approximately mid-2016, and developed the products it needed internally or with other partners.  After that, during the Relevant Period, Icaro continued to pitch additional products to Telco 1, but Telco 1 did not engage with Icaro about re-launching another product.

6.      Icaro never launched any product with Telco 2.  While Telco 2 engaged in efforts with Icaro to launch a product, those efforts were stymied by various issues, including Icaro's failure to obtain the appropriate licenses for its content.  Despite that, Feller repeatedly claimed that launches were imminent – and even, on at least one occasion, that the launch had occurred.

7.      Feller made other misrepresentations to investors, including making false claims about high-profile business leaders coming in as strategic investors, including such claims about

the founder and former CEO of a high-profile sportswear company and the founder of a personal finance application.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a)(2)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to each disgorge all ill-gotten gains they each received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Feller from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file

reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Among other things, Icaro has its principal place of business in this District and Feller solicited, offered, and/or sold securities to investors residing in this District.

## DEFENDANTS

15.     Icaro was originally incorporated under the name Sport 195, Inc. ("Sport 195") in June 2009 in Nevada. In June 2016, Sport 195 changed its corporate name to SKYY Digital Media Group, Inc. ("SKYY").  In June 2020, VOS Digital Media Group, Inc. ("VOS") acquired SKYY.  In August 2020, VOS filed a name change to Icaro (Sport 195, SKYY, and VOS, collectively, the "predecessor entities").  Icaro has its principal place of business in New York, New York.  Icaro has not engaged in any registered offerings of securities, and no class of its securities are registered with the Commission.

16.     Feller, age 59, resides in Santa Barbara, California.  Feller is the Chairman and CEO of Icaro and, prior to Icaro's formation, served in various executive capacities with the predecessor entities.  In addition, Feller is a 50% co-owner, Managing Partner, and Acting Chairman of the Americas of Cronus Equity, LLC ("Cronus").

**FACTS**

**I.      BACKGROUND**

     **a.  Company History**

17.     Icaro was founded in 2009 as Sport 195, which purported to be "the world's first global online sports platform" offering "one of the largest repositories of sports data and information in the world."

18.     In 2015, Feller was appointed Acting Chairman and CEO of Sport 195, which, in June 2016, changed its corporate name to SKYY.

19.     On December 19, 2017, Feller resigned as CEO of SKYY, and in February 2019, he was appointed CEO of VOS.

20.     In late 2019, Feller began planning a VOS acquisition of SKYY.  By at least October 2019, Feller was re-appointed CEO of SKYY and, thereafter, dually served as CEO of both VOS and SKYY until VOS completed its acquisition of SKYY in June 2020.

21.     In August 2020, VOS formally changed its name to Icaro.

22.     Icaro and its predecessor entities[1] worked to develop digital platforms and smartphone apps that aggregate sports news by pulling content from the internet and personalizing that content for individual customers.

---

[1] For convenience, from this point forward, we will refer to Icaro and its predecessor entities together as Icaro.

23. To generate revenue, Icaro planned to customize its digital platforms to the specific needs of its partners, including the Telcos and other smaller partners, by creating branded websites and smartphone apps that Icaro's partners would market to their subscribers.

**b. Capital Raise**

24. During the Relevant Period, Icaro raised over $22 million from at least 38 outside investors through a series of private offerings that falsely promised investors exponential growth in both revenue and stock value.

25. Feller pitched to prospective investors a revenue strategy in which Icaro's digital platforms and smartphone apps, purportedly pre-loaded onto mobile phones, would drive user traffic translating into millions of advertising dollars and other revenue split between Icaro and the Telcos.

26. Feller provided prospective investors with false and misleading revenue forecasts, investor presentations and other materials touting imminent launches with the Telcos as the key drivers of Icaro's revenue projections.

27. Icaro reported $271,379 total revenues in 2015 and 2016, no revenues from 2017 to 2019, $3,632 in revenues in 2020, $50,000 in revenues in 2021, and $127,000 in revenues in 2022.

6

II.    **DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS TO INVESTORS CONCERNING ICARO'S RELATIONSHIPS WITH TELCO 1 AND TELCO 2**

    a.    **Telco 1**

        A.    *Prior to the Relevant Period, Icaro and Telco 1 Attempted to Partner but Those Efforts Failed*

28.    In July 2013 and May 2014, Telco 1 invested in Icaro, making Telco 1 Icaro's largest outside shareholder at the time of its investment.

29.    In 2014, Icaro developed webpages for one of Telco 1's subsidiaries.  Those websites were live from approximately early 2014 to early 2015.

30.    By 2016, Telco 1 had terminated those websites for a variety of reasons, including Telco 1's concern about Icaro's failure to procure licenses for the sports content on the websites and Icaro's difficulty with fulfilling deliverables and meeting launch deadlines.

31.    In 2014, Icaro developed a webpage for a second Telco 1 subsidiary.  Telco 1 terminated Icaro's contract for development and operation of that website by sometime in 2016.

32.    By mid-2016, Telco 1 had suspended all business with Icaro.

        B.    *Telco 1 Pivoted to Another Content Partner During the Relevant Period*

33.    In January 2017, Telco 1 entered into an exclusive agreement with another sports media company to provide similar services that Icaro was pitching to Telco 1 ("Icaro's Competitor").

34.    After January 2017, Icaro continued to pitch products to Telco 1 but those conversations did not progress beyond the pitch stage.

35.    When it pitched products to Telco 1, Icaro repeatedly represented that it was about to launch a product with Telco 2.  In response, Telco 1 told Icaro that Telco 1 would not

entertain any future potential partnership until Icaro executed a successful launch with Telco 2, which never happened.

36.    Icaro did not fully develop, test or receive approval from Telco 1 of any smartphone apps, websites, or other platforms for Telco 1 for any of the 17 plus markets for which Icaro has claimed it was poised to launch during the Relevant Period.

### C.    *Despite Having No Agreement in Place, Defendants Started Touting Imminent Launches with Telco 1*

37.    On February 17, 2017, Feller emailed a potential investor a corporate deck in which he indicated: "We expect to launch with [Telco 1's subsidiary] and [its] subsidiaries in Q3 and Q4 2017 across more than 19 countries and 400 million potential users."

38.    On April 12, 2017, Feller emailed someone who was going to help find investors for Icaro, indicating that Icaro had "[c]urrent" and "signed contracts" with various companies including Telco 1, and sending a presentation projecting net revenue of nearly $1.4 million primarily from its partnerships with Telco 1 and Telco 2 in the second quarter of 2017 and a total of over $14 million for 2017.

39.    On June 7, 2017, Feller wrote to a potential investor, offering an investment in Icaro on the "same terms as our lead strategic investors," claiming that "[i]n Q3 2017, we will begin to power [Telco 1's subsidiary] apps in the 17 markets where they operate across Latin America.  They have over 275M customers across the region."

40.    On September 20, 2017, Feller wrote to a potential investor, "[Telco 1]: In Q3 2017, we will begin to power [Telco 1's subsidiary] apps in the 17 markets where they operate across Latin America.  They have over 275M customers across the region."

41.    On November 3, 2017, Feller emailed a potential investor "[Telco 1], a NYSE corporation, has invested close to $14 million and owns approximately 13% of Skyy DMG. We

expect to begin deployment of the application in partnership with [Telco 1] across Latin America in late 2017 early 2018."

42.    Between 2017 and early 2023, Telco 1 continued its exclusive relationship with Icaro's Competitor, and did not engage in any significant communications with Icaro about entering into any business.

D.    <u>After Feller Returned to Icaro in Late 2019, He Resumed Making False Statements About Imminent Business with Telco 1</u>

43.    On February 19, 2020, Feller told an investor who was considering a further investment that Icaro had "many new developments with our contracts with [Telco 1] over the last few weeks...."  Feller also said that Icaro currently had "over 500M Cell devises [sic] under contract [with Telco 1's subsidiary] and [Telco 2's subsidiary])...."

44.    On February 28, 2020, Feller sent an email to several of his contacts asking for it to be shared with potential investors, indicating that Icaro had "exclusive contracts to launch over 500m cell phone devices with the white label AP [sic]" with Telco 1 and Telco 2.

45.    On January 26, 2021, Feller sent a potential investor a January 2021 Investor Presentation containing a "Launch Strategy" with a series of planned launches in 2021 for Telco 2 and Telco 1.  A slide titled "Icaro Forecast" included net revenue of $649,193 in 2020.  According to its own balance sheet, Icaro earned $3,632 in revenue for 2020.  The slide projected nearly $12 million in net revenue for 2021, over $54 million in net revenue in 2022, and over $151 million in net revenue in 2023.

46.    On March 10, 2021, Feller was copied on an email exchange between an officer of Icaro and several Telco 1 employees.  The Icaro officer sent a copy of Icaro's revenue projections to a CFO of Telco 1, and indicated that "With the goal of a potential partnership with [Telco 1] we included this opportunity in our forecast model."  In response, another executive of

9

Telco 1 asked "Question:  Which potential partnership with [Telco 1] are you referring to specifically?"  The Icaro officer responded "A potential partnership specific to the telecom market in the region."  The Telco 1 executive told Feller and the Icaro officer: "I think the model should include current partnerships only…."

47.     Later on March 10, 2021, Feller responded on the same email chain, saying, "I think it's important to point out that in our projections, we have companies currently under contract and companies pending.  For [Telco 1], we made assumptions on possible launch by geographic footprint in Q4 …We can remove this information and send these numbers to you and [the Telco 1 CFO] or we can review online together."  That same day, in response, the Telco 1 executive expressed concern about whether the assumptions for Telco 1 made sense because "there are no commercial initiatives between us not even discussions around the company's products at this point…."

48.     In response, Feller assured the Telco 1 employees on the email chain that he would remove the Telco 1 projections, saying "Ref [Telco 1] assumptions – understood. we [sic] will strip these down so that it only reflects what we have under contract and or in closing to go to contract."

49.     On March 25, 2021, Feller sent a potential investor a January 2021 Investor Presentation containing a "Launch Strategy" with 2021 launch dates for Telco 1 and projected net revenue numbers based on business with Icaro's Telco partners, even after Feller had promised Telco 1 he would remove all Telco assumptions from Icaro's projections.

50.     In the March 25, 2021 email, Feller told the potential investor: "We are looking to close out the last $3.5m of the $15m round" and noted that they had "pending agreements" with Telco 1.

10

E. *Contrary to Feller's Statements, Telco 1 Never Reinvested in Icaro After 2015*

51.     Between 2015 and 2022, Telco 1 did not invest any additional funds in Icaro.

52.     On March 25, 2021, Feller told a potential investor that Telco 1 made an additional investment in Icaro's latest investment round.

**b. Telco 2**

A. *Icaro and Telco 2 Attempted to Launch an App Together, But Were Stymied by Technical Difficulties*

53.     In November 2016, Icaro signed a one-year partnership agreement with a subsidiary of Telco 2, a mobile telecommunications company in Brazil, for Icaro to develop its platform for potential distribution by Telco 2.

54.     From November 2016 through mid-2017, Icaro worked on trying to resolve technical issues, such as loading incorrect content and layout errors for the product that had to be addressed before any launch.

B. *Despite Not Being Close to Launch, Defendants Repeatedly Claimed That the Launch of Its Product with Telco 2 was Imminent*

55.     On February 17, 2017, Feller emailed a corporate deck to a potential investor which included the claim that: "In March we are going live with our partnership with [Telco 2]. Over 70 million [Telco 2's subsidiary] customers will be provided a sport app and website white labeled as [Telco 2's subsidiary] Sports."

56.     On March 12, 2017, Feller, on behalf of Icaro, and an individual who agreed to solicit investments for Icaro (the "Recruiter") entered into a commission agreement entitling the Recruiter to a commission for any investment funds that the Recruiter was able to source for Icaro.

57.    On April 4, 2017, Feller emailed the Recruiter, informing him that Icaro "will go live in [Telco 2's] largest market with the first 90M smart devises [sic] within the next 3 weeks…In addition, we are: preparing launch dates with [Telco 1's CEO], #4 global largest Telco which we already have contracted and plan to launch 350M devices in Q2 2017, [sic]  We expect to realize a 2x+ valuation increase thus an approx. $4.00+ share price."

58.    On April 12, 2017, Feller emailed another individual who was going to help find investors for Icaro a presentation projecting net revenue of over $1.4 million primarily from its partnerships with Telco 1 and Telco 2 in the second quarter of 2017 and a total over of $14 million for 2017.

59.    On April 24, 2017, Feller emailed an investor a pitch for that investor to share with her contact who was a potential investor: "The Company already has an addressable market of over 400 Million users available under signed contracts with global mobile telecom providers including: [Telco 1], [Telco 2]…. White labeled app for major telco's and media companies for turn key solution to controlled media content and are expected to grow to over 1,4B [sic] audience base by the beginning of 2018 via current contracts with [Telco 1], [Telco 2]…."

60.    On June 7, 2017, Feller wrote to a prospective investor: "It is entirely feasible for what we have in contract or going to contract currently that we will surpass the $1.5 B valuation mark before the end of 2017… In June 2017, we will be launching with [Telco 2] in Brazil as their sports app and website under their brand [Telco 2's subsidiary]…"

## C.  *Icaro Falsely Blamed its Product Launch Delays on Telco 2*

61.    By July 2017, Icaro still was unable to launch the product for Telco 2.  On July 14, 2017, Icaro and Telco 2's subsidiary executed an amendment to the agreement, extending the

terms of the agreement to June 1, 2018 to provide Icaro additional time to address the issues with the application.

62.    On August 10, 2017, Feller wrote a potential investor that the Telco 2 launch was delayed "one fiscal quarter due to technology issues on their side."  He indicated that "we go live to the public with [Telco 2's subsidiary] August 28th.  The revenue spigot turns on immediately on that date."

### D. *In the Fall of 2017, Defendants Continued to Make False Statements About Imminent Launches of Products with Telco 2*

63.    On September 20, 2017, Feller wrote to a potential investor, "[Telco 2]: In June 2017, we will be launching with [Telco 2] in Brazil as their sports app and website under their brand [Telco 2's subsidiary]. [Telco 2] has over 50M customers and there are over 200M potential customers in Brazil. We believe we can become the #1 sports app in Brazil within 12 to 18 months."

64.    From October 24, 2017 to October 31, 2017, Telco 2's subsidiary ran a small simulation for its employees to test Icaro's demonstration version of the android smartphone app it built for Telco 2's subsidiary.  During the simulation, Telco 2's subsidiary identified technical issues, such as loading delays and layout errors.

65.    On October 26, 2017, Feller emailed the Recruiter that Icaro "has gone live this week with the [Telco 2] APP."

66.    Shortly after October 26, 2017, Feller informed the Recruiter that there were launch delays due to technology issues in connection with the launches he indicated had already gone live in his October 26, 2017 email.

67.     Notwithstanding his knowledge of the launch delays, on November 3, 2017, Feller emailed a potential investor, stating that Icaro's "forecast model projects that by the end of 2018 this partnership [with Telco 2] will generate over $16 million USD in net revenue…"

E.    *In 2018, Icaro Struggled to Fix Issues with Its Product for Telco 2*

68.     On January 9, 2018, Icaro released a smartphone app for Telco 2 to the Google Play Store.  However, Telco 2 never approved that version of the smartphone app, and Telco 2 never did a public launch of the smartphone app.

69.     On January 18, 2018, employees of Telco 2 internally expressed concerns about: (i) Telco 2's subsidiary not being able to test or use the smartphone app in Apple phones because Icaro's iOs app had not been approved by Apple; and (ii) slow loading of content.  The email notes that they had asked Icaro to solve the slow loading issue.  In that same communication, a Telco 2 employee expressed concerns that Icaro's business plan had aggressive assumptions and they needed to work with Icaro to "align the assumptions and expectations of their [business plan] with the reality."

70.     In February 2018, Icaro launched another flawed employee demonstration for Telco 2's subsidiary.

71.     On June 14, 2018, Telco 2 extended its agreement a second time, to June 1, 2020, to give Icaro more time to resolve technical problems with the product and to obtain licenses for its content.

72.     At the end of 2018, Telco 2's subsidiary determined that it could not use Icaro's unlicensed content and proposed putting content provided by another Telco 2 subsidiary on Icaro's platform.  Icaro declined this proposal.

F. *In Connection with Raising Money for the Merger of SKYY and VOS, Defendants Admitted that no Telco 2 Product Had Launched to Date and Misrepresented Telco 2's Position*

73.     As noted above, Feller separated from Icaro between the end of 2017, when Feller resigned as CEO of SKYY, and February 2019, when Feller was appointed CEO of VOS.

74.     In August 2019, Feller initiated a corporate merger of SKYY and VOS (subsequently re-named Icaro), raising over $4 million from three investors.

75.     As of August 29, 2019, Icaro was on the brink of collapse.  Icaro's technology ceased operating, and its technology team, management and board of directors had disbanded. That day, Feller sent an email to investors seeking funds to save Icaro.

76.     In the email, Feller acknowledged that no product had ever launched with Telco 2, saying: "[Telco 2] is within 10 day [sic] of cancelling the [Icaro] / [Telco 2] Contract that a very important investor of [Icaro] and I put together over 2 years ago…To date, this has not gone live."

77.     In the same email, Feller told the investors that he had "spoken with [Telco 2] and they will continue the contract as long as VOS steps in to operate knowing that we have the technology team, video exchange technology platform and management team to execute the agreement.  [Telco 2] will expand the contract to include Sports, Breaking News, Finance, Wellness, Fashion, etc."

78.     This email was false as Telco 2 did not condition continuing its contact with Icaro on VOS stepping in.  Moreover, in late summer 2019, Telco 2 did not have conversations with Icaro about expanding its contract with Icaro.

G. *Defendants Continued to Make False Statements About Their Business Dealings with Telco 2 between 2019 to 2021*

79.     On September 26, 2019, Feller wrote to two business contacts about finding investors.  He told them: "We have an extended agreement being signed today w [Telco 2] to expand the sports app agreement for all video to initially launch on 100 m cell phone devices promoted by [Telco 2] to include sports, breaking news, finance, wellness healthcare, special interest and social media."

80.     No contract was signed with Telco 2 on September 26, 2019.

81.     On October 1, 2019, Feller wrote to a potential investor, "[Icaro] currently has contracts with [Telco 1] and [Telco 2] to launch a white label sports app...The [Telco 2] Agreement is projected to generate Rev $10m in 2020 and Rev $64m in 2023 if it has the [Icaro] digital video technology and platform."

82.     On October 16, 2019, Feller told a prospective investor that he was meeting with the "President of [Telco 2]" and others to "finaliz[e] launch dates and expansion of the contract."

83.     Telco 2 has no records of any emails, meetings or calendar invitations between Feller and Telco 2 in 2019.

H.  *In 2020, Icaro Continued to Attempt to do Business with Telco 2, but Telco 2 Terminated its Agreement with Icaro*

84.     In January 2020, an Icaro employee reached out to representatives from Telco 2's subsidiary again about a potential opportunity for new business.  Representatives from Telco 2's subsidiary met with Icaro representatives but declined to move forward.

85.     On February 14, 2020, Telco 2's subsidiary informed Icaro that it intended to terminate the agreement with Icaro.

86.     Five days later, on February 19, 2020, Feller told an investor who was considering a further investment that Icaro had "many new developments with our contracts with [Telco 2] over the last few weeks and we are preparing for launch of our first 40m cell phone devices with

16

[Telco 2] now."  Feller also said that Icaro had "over 500M cell devises [sic] under contract ([Telco 1's subsidiary] and [Telco 2's subsidiary])."

87.    Telco 2 did not enter into a new agreement with Icaro in February 2020.

88.    On February 28, 2020, Feller wrote to a business contact asking him to share with a potential investor that Icaro had "exclusive contracts to launch over 500m cell phone devices" with Telco 1 and Telco 2.

89.    On July 9, 2020, Icaro and Telco 2 terminated the contract, retroactive to June 2020.

90.    On January 26, 2021, Feller sent a potential investor a January 2021 Investor Presentation containing a "Launch Strategy" with a series of planned launches in 2021 that included Telco 2.

c.    **Defendants' Statements To Investors Regarding Telco 1 and Telco 2 Were False and Misleading.**

91.    Regarding the emails Feller sent during the Relevant Period to potential investors concerning the launches or near launches of partnerships with Telco 1 and Telco 2, Defendants knew or recklessly disregarded that no such launches were imminent and the statements to such potential investors were false and misleading.

92.    Regarding the emails Feller sent during the Relevant Period to potential investors concerning Telco 1, Defendants knew or recklessly disregarded that Telco 1 had terminated all product launches prior to the Relevant Period and Icaro never got close to launching another product with Telco 1.

93.    Regarding statements Feller made during the Relevant Period to potential investors about the existence of contracts with Telco 1 and the number of cell phone devices

under contract with Telco 1, Defendant knew or recklessly disregarded that no contracts existed between Icaro and Telco 1 to launch products during the Relevant Period.

94.    Regarding Defendants' distribution during the Relevant Period to potential investors of Icaro's revenue projections based on existing business partnerships with Telco 1, Defendants knew or recklessly disregarded that these projections were false and misleading.

95.    Regarding Defendants' representations during the Relevant Period to potential investors that Telco 1 had invested in Icaro during the Relevant Period, Defendants knew or recklessly disregarded that Telco 1 never invested during the Relevant Period and those statements were false and misleading.

96.    Regarding Defendants' representations during the Relevant Period to potential investors that Icaro was involved in launching a project for Telco 2, Defendants knew or recklessly disregarded that the product never got close to launching during the Relevant Period, and never ultimately launched.

97.    Regarding Defendants' representations during the Relevant Period to potential investors that Icaro was about to go live with its product for Telco 2, Defendants knew or recklessly disregarded that those statements were false and misleading.

98.    Regarding Defendants' statements during the Relevant Period to potential investors in which they predicted the revenues Icaro would receive from its partnership with Telco 2, Defendants knew or recklessly disregarded that those predictions had no basis in fact and their statements to potential investors were false and misleading.

99.    Regarding Defendants' statement during the Relevant Period to investors in which they blamed the launch delays on Telco 2, Defendants knew or recklessly disregarded that the launches were delayed because of Icaro:  Icaro had not obtained the necessary licenses for the

content, and had not ironed out the technical issues with the product.  Feller knew or recklessly disregarded that his statement to potential investors blaming Telco 2 was false and misleading.

100.    Regarding Defendants' statement during the Relevant Period to potential investors that Icaro's product for Telco 2 had already gone live, Defendants knew or recklessly disregarded that statement was false and misleading.

101.    Regarding Defendants' statements during the Relevant Period to potential investors claiming that Telco 2 wanted one of Icaro's predecessor companies, VOS, to take over SKYY, Defendants knew or recklessly disregarded those statements were false and misleading; Telco 2 did not opine on Icaro's corporate structure nor have a position on whether SKYY and VOS merged.

102.    Regarding Defendants' statements during the Relevant Period to potential investors, after Telco 2 informed Icaro that it was going to terminate its contract, that a contract still existed or that it was preparing to launch a smartphone app with Telco 2, Defendants knew or recklessly disregarded those statements were false and misleading.

### III.    STATEMENTS ABOUT ALLEGED CEO INVESTORS

#### a.    Sportswear CEO

103.    In 2016, Icaro solicited an investment from the founder and former CEO of a major sportswear company (the "Sportswear CEO").

104.    On December 13, 2016, a representative for the Sportswear CEO emailed Feller indicating that the Sportswear CEO was "just not interested…."

105.    On August 10, 2017, Feller emailed a potential investor and listed the Sportswear CEO as one of "The primary investors who I would categorize as Strategic Billionaires who put in cash for the shares," indicating that the Sportswear CEO was "in process now."  In another

email to a potential investor on the same day, Feller listed the Sportswear CEO on a list of "lead strategic investors."

106.    Feller emailed potential investors on February 14, 2020 and February 19, 2020, listing the Sportswear CEO as a pending investor.

107.    By letter dated December 17, 2020, the Sportswear CEO's attorneys sent a formal demand for Icaro to "cease and desist" from solicitation of investors using the Sportswear CEO's name.  The letter indicated that the Sportswear CEO had never invested in Icaro or its predecessor entities and "never authorized the use of his name to solicit investments in" Icaro.

108.    The Sportswear CEO never invested in any Icaro entity.

### b. <u>Personal Finance CEO</u>

109.    On February 13, 2020, Feller reached out to a business contact for a personal finance company's CEO (the "Personal Finance CEO") about potentially investing in Icaro.

110.    Without receiving any response from the Personal Finance CEO, the next day, Feller emailed a potential investor listing the Personal Finance CEO as a pending investor.

111.    On February 28, 2020, Feller listed the Sportswear CEO as a "pending" investor in an email to a business contact of the Personal Finance CEO that was intended to solicit the Personal Finance CEO's interest in investing in Icaro.  Four minutes later, Feller listed the Personal Finance CEO as "pending," in an email to a business contact of the Sportswear CEO that was intended to solicit the Sportswear CEO's interest in investing in Icaro.

112.    Feller never received any indication that the Personal Finance CEO was interested in investing in Icaro.  On March 7, 2020, Feller reached out again to the business contact for the Personal Finance CEO to find out if he had heard back from the Personal Finance CEO, indicating that it "Would be great to have him come onboard…Have $1m left out of the $7M if

[another potential investor] commits...”  The business contact replied that day that he had not heard back from the Personal Finance CEO's team.

113.    The Personal Finance CEO never invested in any Icaro entity.

c.    **Statements To Investors About CEO Investors Were False and Misleading**

114.    With respect to statements that Feller made to potential investors regarding the Sportswear CEO and Personal Finance CEO investing in Icaro, Defendants knew or recklessly disregarded that neither the Sportswear CEO nor the Personal Finance CEO had committed to investing in Icaro.  In fact, representatives for the Sportswear CEO wrote to Feller directing him to cease and desist using the Sportswear CEO's name in investor solicitation emails.

115.    With respect to statements that Feller made to potential investors regarding the Sportswear CEO and Personal Finance CEO investing in Icaro, Defendants knew or recklessly disregarded that Feller's statements to potential investors concerning the purported CEO investors were false and misleading.

IV.    **INVESTOR MONIES TO FELLER, THROUGH HIS ENTITY CRONUS**

116.    During the Relevant Period, Icaro paid Feller a total of approximately $167,000 in salary and consulting payments, including cash payments marked in the general ledger as salary.

117.    During the Relevant Period, Icaro also transferred $685,500 to Cronus for consulting fees.

118.     In addition to salary and consulting payments, during the Relevant Period, Icaro sent Cronus, net, almost $1.2 million.[2,3]  The vast majority of funds that Icaro transferred to Cronus were investor funds.

119.     During the Relevant Period, Feller dissipated over $1.2 million net from the Cronus account for his personal benefit.

## V.    TOLLING AGREEMENTS

120.     Icaro and Feller signed tolling agreements with the Commission on July 20, 2021 (Icaro and Feller), January 18, 2022 (Icaro and Feller), July 13, 2022 (Icaro), July 14, 2022 (Feller), December 29, 2022 (Icaro and Feller), April 11, 2023 (Icaro and Feller), June 28, 2023 (Icaro and Feller), and September 28, 2023 (Icaro and Feller).  These agreements, collectively, when entered tolled the statute of limitations applicable to any action brought by the Commission from July 15, 2021 to January 15, 2024.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)

121.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 9 and 12 through 120.

122.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of

---

[2] In addition, during the Relevant Period, investors sent Cronus at least $1,425,000 in investment funds, which Cronus forwarded to Icaro.
[3] This figure deducts almost $800,000 of expenses that it appears Cronus may have paid on behalf of the Icaro entities.

a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

123.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

124.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 9 and 12 through 120.

125.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

126.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter:

### I.

Final Judgments permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. §§ 77e(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(b)];

### II.

Final Judgments ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Final Judgments ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

A Final Judgment permanently prohibiting Feller from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**V.**

Final Judgments granting any other and further relief this Court may deem just and proper.

### **JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
         April 17, 2024

                              /s/ *Antonia Apps*
                              ANTONIA M. APPS
                              REGIONAL DIRECTOR
                              Tejal D. Shah
                              Adam S. Grace
                              Abigail E. Rosen
                              Liora Sukhatme
                              Brenda Wai Ming Chang
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              100 Pearl Street
                              Suite 20-100
                              New York, NY 10004-2616
                              212-336-0473 (Rosen)
                              RosenAb@sec.gov